UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
REV. JOHN PAUL HANKINS,

                Plaintiff,

      - against -

THE NEW YORK ANNUAL CONFERENCE OF
THE UNITED METHODIST CHURCH, THE
STONY BROOK COMMUNITY CHURCH
(UNITED METHODIST), and BISHOP
ERNEST S. LYGHT,

                Defendants.
----------------------------------------------------------------X

**MEMORANDUM AND ORDER**
03-CV-3275 (DRH) (ETB )

**APPEARANCES:**

**GLYNN MERCEP and PURCELL, LLP**
Attorneys for Plaintiff
North Country Road
Post Office Box 712
Stony Brook, New York 11790
By: Bradley C. Abbott, Esq.

**LAW OFFICES OF FREDERICK K. BREWINGTON**
Attorneys for Defendants
50 Clinton Street, Suite 501
Hempstead, New York 11550
By: Frederick K. Brewington, Esq.

**WILLIAMS & CONNOLLY LLP**
Attorneys for Defendants
725 Twelfth Street, N.W.
Washington D.C. 20005
By: Kevin T. Baine, Esq.

**HURLEY, District Judge:**

Plaintiff Rev. John Paul Hankins ("Plaintiff") brings the present action against defendants The New York Annual Conference of the United Methodist Church ("NYAC"), the Stony Brook Community Church (United Methodist), and Bishop Ernest S. Lyght ("Bishop Lyght") (collectively, "Defendants") for violations of the Age Discrimination in Employment Act (the "ADEA") and the New York State Human Rights Law ("NYSHRL"), claiming that he was discriminated against on the basis of his age. Defendants have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) and Rule 12(b)(6). For the reasons that follow, Defendants' motion is granted.

## *BACKGROUND*

The following facts are drawn from the Complaint. Hankins was ordained by the NYAC and served as a clergy member from 1962 to July 1, 2003. He turned 70 on November 5, 2002, and was forced into retirement on July 1, 2003 pursuant to paragraph 356 of the Book of Discipline of the United Methodist Church, which provides as follows:

> Every clergy member of an annual conference who will have attained age seventy on or before July 1 in the year in which the conference is held shall automatically be retired.

(Compl. ¶ 12.) The Book of Discipline is "the most current statement of how United Methodists agree to live together," (*id.* ¶ 7), and "contains within its scope subject matters that are sectarian and ecclesiastical in nature being related to the nature of the Deity and the Trinity, the scriptures, the tenets of the United Methodist Church, the theological grounding of biblical faith, the teachings of John Wesley and/or other religious principles or values," (*id.* ¶ 8) as well as "subject matters that are secular, temporal and/or civil in nature not being determined,

2

controlled or influenced by any religious considerations." (*Id.* ¶ 9.) According to the Complaint, paragraph 356, under which Plaintiff was mandatorily retired, "is a secular, temporal, and/or civil subject matter, not being determined, controlled or influenced by any religious considerations." (*Id.* ¶ 13.)

Bishop Lyght, as presiding bishop of the NYAC, told Hankins and other members of the Church that he had the authority to reappoint Hankins as pastor after his retirement but that it was his "personal policy (as distinguished from the policy set forth in the Book of Discipline) never to reappoint members of the clergy who have attained age seventy to the church out of which they were retired." (*Id.* ¶ 19.)

Plaintiff filed the instant action on July 3, 2003, after obtaining a right to sue letter from the Equal Employment Opportunity Commission. He claims that the mandatory retirement policy violates the ADEA, the NYSHRL, and the NYAC's covenant with him. He also alleges that Bishop Lyght's personal policy against reappointing retired clergy violates the ADEA and the NYSHRL. The Complaint seeks damages as well as injunctive relief against Defendants.

On September 17, 2003, the Court, ruling orally, dismissed Plaintiff's Complaint pursuant to Rule 12(b)(6), finding that Plaintiff's ADEA claim was barred by the ministerial exception to the ADEA. (*See* Sept. 17, 2003 Tr., docket no. 22.) Declining to retain subject matter jurisdiction over the remaining state claims, the case was dismissed in its entirety.

By decision dated February 16, 2006, the Second Circuit vacated this Court's September 17, 2003 decision and "remand[ed] for reconsideration under the RFRA [Religious Freedom and Restoration Act] standards." *Hankins v. Lyght*, 441 F.3d 96, 109 (2d Cir. 2006).

By letter dated February 20, 2006, Defendants indicated their intent to move to

dismiss the Complaint. On March 28, 2006, the Second Circuit issued its mandate and on April 5, 2006, the Court issued a briefing schedule with regard to Defendants' motion.

Defendants filed their fully briefed motion with the Court on September 15, 2006. In his opposition papers, Plaintiff indicates that he is withdrawing his request for injunctive relief. He attaches a proposed amended complaint which is nearly identical to the original but for the deletion of the request for injunctive relief and the addition of an expanded monetary demand.

On February 26, 2007, Defendants wrote a letter to the Court advising of a subsequent development in a case cited in their moving brief. (*See* docket no. 41.) By letters dated March 20 and March 28, 2007, the Court was advised that Plaintiff's then counsel had passed away and that Plaintiff was seeking a stay of the proceedings so that he could retain new counsel and reply to Defendants' February 26, 2007 letter. (*Id.* nos. 42, 44.) By Order dated March 30, 2007, the Court stayed decision on the pending motion for thirty days to allow Plaintiff to secure new counsel. On May 4, 2007, Plaintiff's current counsel appeared and was granted an extension to May 18, 2007 to respond to Defendants' letter. Thereafter, counsel was granted a second extension of time to reply. Finally, on May 21, 2007, Plaintiff's counsel submitted a supplemental affirmation. By letter dated May 29, 2007, Defendants indicated that they would not be filing any further papers.

## DISCUSSION

Before the Court can address the merits of the parties' arguments, the Court must first examine the case law both leading up to and following the Circuit's decision in this case. The Court begins by reviewing the ministerial exception.

4

## I.   *The Ministerial Exception*

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1). While the ADEA generally applies to religious institutions, *see DeMarco v. Holy Cross High School*, 4 F.3d 166, 172 (2d Cir. 1993), courts have recognized that in some instances, application of the ADEA to religious institutions conflicts with First Amendment principles.   Accordingly, courts have created a "ministerial exception" whereby religious institutions are immune from discrimination suits by "ministerial" employees.[1]

The ministerial exception was first recognized in *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972), a case in which the Court of Appeals for the Fifth Circuit held that an ordained minister of the Salvation Army could not maintain a Title VII claim for salary discrimination and retaliatory discharge.   "The relationship between an organized church and its ministers," the court explained, "is its lifeblood." *Id.* at 558.   Employing a strict scrutiny analysis, the court held that applying Title VII to that relationship, "would result in an encroachment by the State into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment." *Id.* at 560.

The ministerial exception has since been widely recognized by the federal circuits

---

[1]   The ministerial exception is inapplicable to claims of religious discrimination because section 702 of Title VII permits religious organizations to discriminate against employees on the basis of religion.   42 U.S.C. § 2000e-1(a).

throughout the nation.[2] The exception is premised upon two doctrines, viz. (1) the First Amendment protects the right of a church to conduct its internal affairs without government intervention; and (2) the minister-church relationship is so sacrosanct that discrimination claims arising out of it are inseparable from religious practice. *See supra* note 2.

Although the exception has been applied by numerous federal and state courts in a variety of settings, the Supreme Court has never addressed the scope -- or existence -- of the ministerial exception. Nonetheless, there is "a long line of Supreme Court cases that affirm the fundamental right of churches to 'decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 462 (D.C. Cir. 1996) (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952)). The church autonomy line of cases begins with *Watson v. Jones*, 80 U.S. 679 (1871) where the Court declined to intervene in a property dispute between two factions of a church. The Court stated:

> [W]henever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

*Id.* at 727. Since *Watson*, the Court has repeatedly applied the church autonomy doctrine. *See,*

---

[2] See, *e.g., Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 226 (6th Cir. 2007); *Petruska v. Gannon Univ.*, 462 F.3d 294, 305 (3d Cir. 2006), *cert. denied*, 127 S. Ct. 2098 (2007); *Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1303 (11th Cir. 2000); *Young v. N. Ill. Conf. of United Methodist Church*, 21 F.3d 184, 187-88 (7th Cir. 1994); *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 363 (8th Cir. 1991); *Minker v. Balt. Annual Conf. of United Methodist Church*, 894 F.2d 1354, 1357 (D.C. Cir. 1990); *Natal v. Christian & Missionary Alliance*, 878 F.2d 1575, 1578 (1st Cir. 1989); *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985).

*e.g., Gonzalez v. Roman Catholic Archbishop*, 280 U.S. 1, 16 (1929) ("Because the appointment is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them. In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise."); *Kedroff*, 344 U.S. at 107-08 ("Legislation that regulates church administration, the operation of the churches, the appointment of clergy . . . prohibits the free exercise of religion."); *Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969) ("First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern."); *Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 721-22 (1976) ("[F]reedom encompasses the 'power (of religious bodies) to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'") (quoting *Kendroff*, 344 U.S. at 116).

## II.     *The Smith Decision*

Until 1990, the Supreme Court typically employed a strict scrutiny standard of review to determine whether a government act violated the Free Exercise Clause of the First Amendment. *See Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205

(1972). Under this standard, the government could substantially burden free exercise of religion only if the conduct was the least restrictive means of furthering a compelling government interest. *Sherbert*, 374 U.S. at 403-04; *Yoder*, 406 U.S. at 214-34.

In *Employment Div., Dep't of Human Resources of Or. v. Smith*, 494 U.S. 872 (1990), the Supreme Court, in an opinion written by Justice Scalia, rejected this interpretation of the Free Exercise Clause and instead held that "the right of free exercise does not relieve an *individual* of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." 494 U.S. at 879 (internal quotation marks and citation omitted) (emphasis added). *Smith* involved an Oregon statute which denied unemployment benefits to drug users, including Native Americans who used peyote in religious ceremonies. *Id.* at 890. The Court held that the Free Exercise Clause did not require Oregon to exempt the Native Americans from complying with the statute. *Id.* at 885-90.

After *Smith*, some litigants argued that the Supreme Court's decision undermined the ministerial exception. They contended that a reasonable reading of *Smith* supported the enforcement of Title VII against religious institutions, regardless of whether this would incidentally infringe upon the organization's free exercise rights. This argument has been rejected by most, if not all, of the courts to have considered it. Instead, courts have found that the ministerial exception survives *Smith* because the ministerial exception addresses the rights of the *church* while *Smith* addressed the rights of *individuals*. *See, e.g.*, *Bryce v. Episcopal Church*, 289 F.3d 648, 656 (10th Cir. 2002) (collecting cases).

8

### III.    *The Religious Freedom Restoration Act*

In 1993, in response to *Smith*, Congress enacted the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb. The Congressional findings incorporated into RFRA provide that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise," 42 U.S.C. § 2000bb(a)(2), and that "governments should not substantially burden religious exercise without compelling justification." *Id.* 2000bb(a)(3). They further provide that the *Smith* decision "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion" *id.* 2000bb(a)(4). Therefore, the explicit purpose of RFRA is to "restore the compelling interest test as set forth in *Sherbert* [and] *Yoder* [] and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b).

RFRA's substantive provisions state:

(a) In general.  Government shall not substantially burden a
person's exercise of religion even if the burden results from a rule
of general applicability, except as provided in subsection (b) of this
section.
(b) Exception.  Government may substantially burden a person's
exercise of religion only if it demonstrates that application of the
burden to the person--
(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling
governmental interest.
(c) Judicial relief.  A person whose religious exercise has been
burdened in violation of this section may assert that violation as a
claim or defense in a judicial proceeding and obtain appropriate
relief against a government. Standing to assert a claim or defense
under this section shall be governed by the general rules of
standing under article III of the Constitution.

*Id.* § 2000bb-1.[3]

## IV.    *The Second Circuit Decision in the Present Case*

In vacating this Court's September 17, 2003 decision, the Second Circuit held that

"RFRA was an amendment to the ADEA and, as such, is constitutional." *Id.* at 109; *see also id.*

at 106 ("We join the other circuits in holding that the RFRA is constitutional as applied to federal

law under the Necessary and Proper Clause of the Constitution."). Because this Court did not

apply RFRA, "relying instead on the 'ministerial exception' to the ADEA," the September 17,

2003 Order was vacated and "remand[ed] for reconsideration under the RFRA standards." *Id.* at

109.

> In reaching its holding, the Circuit Court explained:

> The district court dismissed the case based on a "ministerial exception" that some courts had read into various anti-discrimination laws-an unresolved issue in this circuit- including the ADEA.  Whatever the merits of that exception as statutory interpretation or policy, it has no basis in statutory text, whereas the RFRA, if applicable, is explicit legislation that could not be more on point.  Given the absence of other relevant statutory language, the RFRA must be deemed the *full expression* of Congress's intent with regard to the religion-related issues before us and *displace earlier judge-made doctrines* that might have been used to ameliorate the ADEA's impact on religious organizations and activities

*Id.* at 102 (emphases added).  The court further noted:

> The present action is a suit against a church and an official of that church.  The suit claims that the defendants violated a federal statute, the ADEA, and seeks judicial remedies; [Defendants]

---

[3] In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court held that RFRA was unconstitutional as applied to state law because it was beyond Congress's remedial power to regulate states under Section 5 of the Fourteenth Amendment to the Constitution. *Id.* at 536.

claim that application of the statute would substantially burden the exercise of their religion. If the RFRA's test for evaluating burdens on religious activity-Subsections (b)(1) and (2)-is not met, [Defendants] can arguably assert a violation of the RFRA as a complete defense.

*Id.*

Although the court recognized that there was "little case law addressing the issue whether RFRA applies to an action by a private party seeking relief under a federal statute against another private party who claims that the federal statute substantially burdens his or her exercise of religion," the court found that RFRA covered the present action because it involves the ADEA, a statute "enforceable by the EEOC as well as private plaintiffs." *Id.* at 103. While not deciding whether RFRA "applies to a federal law enforceable only in private actions between private parties," the court found that "the substance of the ADEA's prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved private party." *Id.* In doing so, the court rejected the notion that the language in section 2000bb-1(c) of RFRA providing that an individual may use RFRA to "obtain appropriate relief against a government" permitted the assertion of a defense under RFRA only when relief is sought against a governmental party. *Id.*[4]

## V.    *The O Centro Espirita Decision*

In *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), decided less than one week after the Second Circuit's decision, the Supreme Court employed the RFRA compelling interest test to a claim that application of the federal Controlled Substances Act ("CSA") to the religious use of hallucinogenic tea violated the Free Exercise

---

[4] Judge Sotomayer dissented, finding that, inter alia "RFRA by its terms does not apply to suits between private parties," 441 F.3d at 114, and the ADEA was not intended to apply to religious institutions in their selection of spiritual leaders. *Id.* at 117-18.

11

Clause. In *O Centro*, members of the plaintiff religious sect received communion by drinking a tea brewed from plants containing DMT, a hallucinogen banned under the CSA. 546 U.S. at 423. The government conceded that this practice was a sincere exercise of religious but nonetheless sought to prohibit plaintiff from engaging in the practice based on the CSA. *Id.* Plaintiff sued to block enforcement against it, alleging, inter alia, that applying CSA to its sacramental use of the tea violates RFRA, and moved for a preliminary injunction. *Id* at 423, 425-26.

In upholding the injunction granted by the district court, Chief Justice Roberts, writing the unanimous decision for the Court, held that the government had not demonstrated a compelling interest in the uniform application of the CSA to prohibit religious uses of an otherwise illegal drug. Stating that under RFRA, the federal government may not substantially burden a person's exercise of religion unless the government satisfies the compelling interest test, *id.* at 424, the Court noted that at the preliminary injunction hearing, the government conceded plaintiff's prima's facie case, viz. that "application of the [CSA] would (1) substantially burden (2) a sincere (3) religious exercise[]." *Id.* at 428. The burden then shifted to the government to demonstrate that application of that burden was in furtherance of a compelling interest and was the least restrictive means of furthering that interest. *Id.* at 424, 429-30.[5]

The government argued that the CSA precluded any consideration of individualized judicial exceptions because to do so would undermine the entire regulatory

---

[5] The Court rejected the government's argument "that, although it would bear the burden of demonstrating a compelling interest as part of its affirmative defense at trial on the merits, the [plaintiff] should have borne the burden of disproving the asserted compelling interests at the hearing on the preliminary injunction." 546 U.S. at 429.

scheme. *Id.* at 430. Thus, the government maintained that "the [CSA] serves a compelling

purpose and simply admits of no exceptions." *Id.* The Supreme Court rejected this argument,

asserting as follows:

> RFRA, and the strict scrutiny test it adopted, contemplate an
> inquiry more focused than the Government's categorical approach.
> RFRA requires the Government to demonstrate that the compelling
> interest test is satisfied through application of the challenged law
> "to the person"-the particular claimant whose sincere exercise of
> religion is being substantially burdened. 42 U.S.C. § 2000bb-1(b).
> RFRA expressly adopted the compelling interest test 'as set forth
> in [*Sherbert* and *Yoder*]." 42 U.S.C. § 2000bb(b)(1). In each of
> those cases, this Court looked beyond broadly formulated interests
> justifying the general applicability of government mandates and
> scrutinized the asserted harm of granting specific exemptions to
> particular religious claimants.

*Id.* at 430-31; *see also id.* at 431 (quoting *Smith*, 494 U.S. at 899 (O'Connor, J., concurring in

judgment) ("strict scrutiny 'at least requires a case-by-case determination of the question,

sensitive to the facts of each particular claim'"). Thus, the Court found that "[u]nder the more

focused inquiry required by RFRA and the compelling interest test, the Government's mere

invocation of the general characteristics of Schedule I substances [which include DMT], as set

forth in the [CSA], cannot carry the day." *Id.* at 432. Although the Court recognized that

Schedule I substances such as DMT are dangerous, it found that "Congress' determination that

DMT should be listed under Schedule I simply does not provide a categorical answer that

relieves the Government of the obligation to shoulder its burden under RFRA." *Id.*

This conclusion was further buttressed, the Court found, by the regulatory

exemption under the CSA for peyote use for all members of every recognized Indian tribe. *Id.* at

433. Although the government argued that "the existence of a *congressional* exemption for

peyote does not indicate that the [CSA] is amenable to *judicially crafted* exceptions, the Court

found that RFRA "plainly contemplates that *courts* would recognize exceptions-that is how the

law works." *Id.* at 434. "RFRA makes clear that it is the obligation of the courts to consider

whether exceptions are required under the test set forth by Congress." *Id.*

Finally, in discussing "the feasibility of case-by-case consideration of religious

exemptions to generally applicable rules" *id.* at 436, the Court stated as follows:

> We have no cause to pretend that the task assigned by Congress to
> the courts under RFRA is an easy one. Indeed, the very sort of
> difficulties highlighted by the Government here were cited by this
> Court in deciding that the approach later mandated by Congress
> under RFRA was not required as a matter of constitutional law
> under the Free Exercise Clause. See *Smith,* 494 U.S., at 885-890,
> 110 S. Ct. 1595. But Congress has determined that courts should
> strike sensible balances, pursuant to a compelling interest test that
> requires the Government to address the particular practice at issue.

*Id.* at 439.

## VI.  *The Redhead Decision*

In *Redhead v. Conference of Seventh-Day Adventists*, 440 F. Supp. 2d 211

(E.D.N.Y. 2006), Judge Irizarry became the first court in this Circuit to consider how to analyze

an employment discrimination case under RFRA in the aftermath of *O Centro* and the Second

Circuit's decision herein.[6] In *Redhead*, a schoolteacher brought a Title VII discrimination action

against a private religious school after she was fired for being pregnant and unmarried. 440 F.

Supp. 2d at 214. The district court noted its "strong reservations" about applying RFRA to

private parties, but nonetheless examined the teacher's claim under the RFRA compelling

---

[6] Since *Redhead*, there have no other published decisions in this Circuit addressing the
Second Circuit's decision in this context.

interest test. *Id.* at 218. Citing *O Centro* for the proposition that "[t]he compelling interest test required under the RFRA 'is satisfied through application of the challenged law "to the person"- the particular claimant whose sincere exercise of religion is being substantially burdened,'" the district court found that it "must look at the specific facts and circumstances presented by the case before it." *Id.* at 219 (quoting *O Centro*, 546 U.S. at 430-31).

The district court found that even if application of the RFRA compelling interest test is appropriate, its use does not entirely displace the ministerial exception. *Id.* at 200 ("RFRA and the ministerial exception are not mutually exclusive.") It based this conclusion in part on the Supreme Court's language in *O Centro* that "'*judicially crafted* exceptions' are relevant when applying the RFRA's compelling interest test." *Id.* at 219 (quoting *O Centro*, 546 U.S. at 434). It agreed with the Seventh Circuit that "'a serious constitutional issue would be presented if Congress by stripping away the ministerial exception required federal courts to decide religious questions.'" *Id.* at 220 (quoting *Tomic*, 442 F.3d at 1042)). Thus, the court found

> whether applied directly or through the RFRA, the ministerial
> exception guards against excessive entanglement and is a tool for
> analyzing the nature of the alleged burden on religious exercise. It
> is a judicially created doctrine relevant to whether a religious
> organization's hiring decisions regarding a particular individual
> should be insulated based on First Amendment concerns. . . . For
> the RFRA analysis in particular, the ministerial exception is
> necessary for a case-specific application of the compelling interest
> test and is the kind of judicially crafted exception envisioned by the
> Court in *O Centro Espirita*.

*Id.*

Because the ministerial exception did not apply to the facts in that case as

plaintiff's teaching duties were primarily secular, *id.* at 221, the court in *Redhead* concluded that

the defendant could not invoke RFRA as a defense. *Id.* at 222. Although the court did not

explicitly apply the burden shifting formula enunciated in RFRA, the court found that "[t]he

ministerial exception is inapplicable to plaintiff, and there is a compelling interest in ensuring

that Title VII remains enforceable as to employment relationships that do not implicate concerns

under the Free Exercise and Establishment Clauses of the First Amendment." *Id.* at 221.

**VII.**   *The Present Action*

In moving for dismissal of the Complaint, Defendants advance several arguments.

The Court addresses these arguments in seriatim.

>    **A.**   ***The Second Circuit's Decision Compels a Finding***
>    ***That RFRA Displaces the Ministerial Exception***

Defendants argue that RFRA does not supplant "the constitutionally mandated

'ministerial exception.'" (Defs.' Mem. of Law at 6.)

>    RFRA does not purport to alter, and could not alter, the
>    constitutionally mandated 'ministerial exception' that has been
>    recognized by every federal appellate court to consider the
>    question. . . . RFRA was passed to provide an <u>additional</u> layer of
>    statutory protection for <u>individual</u> exercise of religion in situations
>    in which the First Amendment had been held not to require
>    protection. RFRA did not eliminate or reduce in any way the
>    absolute protection that has been accorded <u>institutional church</u>
>    decisions with respect to the employment of clergy.

(Defs.' Mem. of Law at 3-4.)   In other words, because RFRA was enacted to overturn *Smith*,

where the Court found that laws burdening an *individual's* religious practices need not be

justified by a compelling governmental interest if they are neutral and generally applicable,

Defendants contend that RFRA in turn only applies to *individual* rights. They further claim that

the Second Circuit did not squarely rule on whether RFRA applies to claims of *institutional*

autonomy. (*See* Defs.' Mem. of Law at 10 (citing legislative history which suggests that RFRA

was not intended to affect cases determining the relationship between religious organizations and

government); Defs.' Reply Mem. at 1-2.) The Court disagrees.

In finding that "RFRA must be deemed the *full expression* of Congress's intent

with regard to the religion-related issues before us and *displace earlier judge-made doctrines* that

might have been used to ameliorate the ADEA's impact on religious organizations and

activities," 441 F.3d at 102 (emphases added), the Second Circuit clearly read RFRA as

supplanting the ministerial exception with regard to discrimination claims brought against

religious institutions. *See id.* at 103 ("This language [RFRA] easily covers the present action.);

*cf. Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) (stating that Second

Circuit held that RFRA "amended the ADEA to wipe out the ministerial exception and substitute

RFRA's standard, which requires deciding whether a particular law imposes a substantial burden

on religious activity."). If the Second Circuit believed that the ministerial exception in and of

itself was still a viable defense to claims such as those presented here, it would not have vacated

this Court's initial decision which dismissed Plaintiff's claims based thereon.

In sum, given the Second Circuit's directive that the ministerial exception is

inapplicable to the present case, this Court is constrained to conclude that the present suit is not

barred pursuant to the  ministerial exception and, instead, must be analyzed through RFRA.

**B.**  **Analysis of Plaintiff's Suit Through RFRA Compels the Same Result as That Mandated by the Ministerial Exception**

1.  *Defendants' Arguments*

Defendants argue that even if RFRA applies to claims of institutional church autonomy as well as individual rights, "the 'ministerial exception' should be applicable *through* RFRA – as a doctrinal conclusion that there is no governmental interest compelling enough to justify the substantial burden that secular employment requirements would place on the self-governance of a church." (Defs.' Reply Mem. of Law at 3-4 (emphasis added).) This argument essentially tracks that portion of Judge Irizarry's holding in *Redhead* which in essence found that, even without explicit reliance on the ministerial exception, the principles at the core of the exception remain valid and are relevant in applying the compelling interest test under RFRA. 440 F. Supp. 2d at 220. For the reasons that follow, the Court agrees.

Applying RFRA to the instant action, Defendants contend that they easily make out a prima facie case that "application of the [ADEA] would (1) substantially burden (2) a sincere (3) religious exercise." *O Centro*, 546 at 428. In this regard, they claim that "[t]here is no question that overturning the United Methodist Church's mandatory retirement rule for clergy would place a 'substantial burden' on the church's right to determine such matters on its own." (Defs.' Mem. of Law at 14.)

The burden then shifts to Plaintiff to demonstrate that application of the ADEA to Defendants "is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § § 2000bb-1(b). Defendants maintain that the compelling interest test cannot be met here because pursuant

to the rationale of the ministerial exception, the government's interest in prohibiting employment discrimination cannot outweigh a church's right of autonomy. (Defs.' Mem. of Law at 15.) Thus, "although the government clearly has an interest in eradicating age discrimination, it is not compelling in light of the fundamental right of a church to determine who may be trusted with the spiritual function of teaching its ecclesiastical doctrine under the free exercise clause." *Powell v. Stafford*, 859 F. Supp. 1343, 1347 (D. Colo. 1994).

Finally, Defendants argue that even assuming the existence of a compelling governmental interest, application of the ADEA in this case will not further that interest in the least restrictive means possible. "The government's general interest in eliminating age discrimination would be affected only marginally by exempting ministers from its scope. The church's control of its own ministry, on the other hand, cannot be maintained if the state is permitted to interfere in its internal governance and retirement decisions." (Defs.' Mem. of Law at 16.)

## 2. *Plaintiff's Arguments*

In opposing Defendants' motion, Plaintiffs argue Defendants cannot meet their prima facie case under RFRA. Alternatively, Plaintiff argues that there are material issues of fact relating thereto. Plaintiff claims that Defendants will not be able to establish that application of the ADEA to their mandatory retirement policy will substantially burden their exercise of religion. In this vein, Plaintiff states that Defendants have "failed to suggest any real or hypothetical adverse consequence if ADEA is ruled to invalidate the mandatory retirement provisions of §356.1. In such an event, their ability to appoint clergy of their unlimited choice to serve as pastors in every church within the geographic area of NYAC is unimpaired." (Pl.'s

19

Mem. of Law in Opp'n at 9.) Plaintiff further contends that Defendants have violated the

mandatory retirement policy at least once (*see* Pl.'s Aff. dated Aug. 7, 2006, ¶¶ 16-23), and that

this violation belies any contention by Defendants that invalidation of this policy by the ADEA

would substantially burden them. (*Id.* ¶ 24.) Finally, Plaintiff submits that even if application of

the ADEA to this action would substantially burden Defendants' exercise of religion, the

government has a compelling interest in the enforcement of the ADEA.

### 3. Application of the ADEA in This Case Violates RFRA

In the Court's view, Defendants' failure to articulate specific examples of how

application of the ADEA to their mandatory retirement policy will burden them, or the fact that

Defendants may have deviated from this policy on one occasion, does not detract from the

principle that Defendants must have the right to appoint ministers without interference from the

civil courts. Thus, because application of the ADEA to Defendants' mandatory retirement policy

would interfere with Defendants' right to select their own clergy, it places a substantial burden on

Defendants' right to manage their own internal affairs. This conclusion is supported by the "long

line of Supreme Court cases [cited above] that affirm the fundamental right of churches to

'decide for themselves, free from state interference, matters of church government as well as

those of faith and doctrine.'" *Catholic Univ. of Am.*, 83 F.3d at 462 (quoting *Kedroff*, 344 U.S.

at 116).

Plaintiff tries to avoid this result by relying on the allegation in his Complaint that

paragraph 356 of the Methodist Book of Discipline – which contains the mandatory retirement

policy – is secular in nature. Regardless of the label Plaintiff attaches to paragraph 356,

Plaintiff's Complaint is a direct challenge to Defendants' right to appoint clergy and, as such,

places an impermissible burden on Defendants' exercise of religion. *See Petruska v. Ganon Univ.*, 462 F.3d 294, 306-07 (3d Cir. 2006) ("[T]he process of selecting a minister is *per se* a religious exercise. . . . [A]ny restriction on the church's right to chose who will carry its spiritual message necessarily infringes upon its free exercise right to profess its beliefs."), *cert. denied*, 127 S. Ct. 2098 (2007); *Catholic Univ. of Am.*, 83 F.3d at 465 ("[T]he free exercise clause of the First Amendment protects the act of a decision rather than a motivation behind it. In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content.") (internal quotation marks and citation omitted); *McClure*, 460 F.2d at 560 ("An application of the provisions of Title VII to the employment relationship which exists between The Salvation Army and Mrs. McClure, a church and its minister, would involve an investigation and review of these practices and decisions and would, as a result, cause the State to intrude upon matters of church administration and government which have so many times before been proclaimed to be matters of a singular ecclesiastical concern.).[7] Thus, the Court finds that Defendants have made a prima facie case under RFRA.

In attempting to rebut Defendants' prima facie case, Plaintiff argues that the government has a compelling interest in the enforcement of the ADEA. While that may be generally true, the Court finds that the government's interest is not compelling in the instant case,

---

[7] The same reasoning applies to Plaintiff's allegation that Bishop Lyght acted pursuant to his "personal policy" of not reappointing clergy who had reached age seventy. Prescinding from the fact that Bishop Lyght's "personal policy" was consistent with the church's policy, the reasons behind Bishop Lyght's actions are not germane for present purposes. *See Combs v. Cent. Texas Annual Conference of the United Methodist Church*, 173 F.3d 343, 350 (5th Cir. 1999) ("[W]e cannot conceive how the federal judiciary could determine whether an employment decision concerning a minister was based on legitimate or illegitimate grounds without inserting ourselves into a realm where the Constitution forbids us to tread, the internal management of a church.").

in light of Defendants' fundamental right to employ ministers of their choosing. *See Cath. Univ. of Am.*, 83 F.3d at 467-68 ("[T]he Government's interest in eliminating employment discrimination is insufficient to overcome a religious institution's interest in being able to employ the ministers of its choice."); *Powell*, 859 F. Supp. at 1347 ("[A]lthough the government clearly has an interest in eradicating age discrimination, it is not compelling in light of the fundamental right of a church to determine who may be trusted with the spiritual function of teaching its ecclesiastical doctrine under the free exercise clause.").

Finally, the Court easily disposes of Plaintiff's suggestion that the ADEA is applicable to Defendants because the Second Circuit in *DeMarco* found that the ADEA applies to religious institutions. 4 F.3d at 172. Plaintiff's reliance on *DeMarco* is misguided because *DeMarco* explicitly confined its analysis to the termination of a lay employee with few religious duties. *Id.* at 172 ("There may be cases involving lay employees in which the relationship between employee and employer is so pervasively religious that it is impossible to engage in an age-discrimination inquiry without serious risk of offending the Establishment Clause. This is not such a case.").[8]

In sum, after applying the RFRA strict scrutiny test, the Court finds that application of the ADEA to Defendants would place a substantial burden on their right to chose their own clergy and that the government does not possess a compelling interest in prohibiting

---

[8] Although the Supreme Court in *O Centro* stated that RFRA cases should be decided on a case-by-case basis, it is questionable whether *O Centro* was intended to apply to the rights of churches, as opposed to the rights of individuals, the latter of which were at stake in *O Centro*. In that regard, it is doubtful that *O Centro* intended to displace Supreme Court precedent regarding the church autonomy doctrine with a fact specific inquiry relating to religious institutions and matters of purely ecclesiastical concerns.

22

age discrimination in the employment thereof. Thus, even if the ministerial exception is not applicable in this manner, RFRA's strict scrutiny standard compels an identical result.[9]

### CONCLUSION

For all of the above reasons, Defendants' motion to dismiss is GRANTED. Upon entry of judgment, the Clerk is directed to close this case.

**SO ORDERED.**

Dated: September 28, 2007
        Central Islip, New York                    /s_____
                                                   Denis R. Hurley,
                                                   United States District Judge

---

[9] The remaining claims in this case arise under state law. Having found that the allegations in the Complaint do not support federal jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. *See* 28 U.S.C. § 1367(c)(3). Accordingly, all state law claims are dismissed without prejudice to refiling in state court.